# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

MASS ENGINEERED DESIGN, INC.,

       Plaintiff,

       v.

PLANAR SYSTEMS, INC.,

       Defendant.

Case No. 3:16-cv-1510-SI

**OPINION AND ORDER**

John Mansfield, HARRIS BRICKEN, 121 SW Morrison St., Suite 400, Portland, OR 97204, Stephen F. Schlather, John J. Edmonds, Shea N. Palavan, and Brandon G. Moore, COLLINS, EDMONDS, SCHLATHER & TOWER, PLLC, 1616 South Voss Road, Suite 125, Houston, TX 77057 Of Attorneys for Plaintiff.

Jacob S. Gill, STOLL STOLL BERNE LOKTING & SHLACHTER, P.C., 209 SW Oak Street, Suite 500, Portland, OR 97204; Jenny W. Chen, CHEN IP LAW GROUP, 7F, N0. 1, Alley 30, Lane 358, Rueiguang Road, Neihu District, Taipei City 114, Taiwan (R.O.C.); Andrew T. Oliver, AMIN, TUROCY & WATSON, LLP, 160 West Santa Clara Street, Suite 975, San Jose, CA 95113. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

       Plaintiff Mass Engineered Design, Inc. ("Mass") brings this lawsuit against Defendant

Planar Systems, Inc. ("Planar"), alleging infringement of U.S. Patent No. RE36,978 (the "'978

Patent") and U.S. Patent No. 8,102,331 (the "'331 Patent"). Before the Court are five motions for

summary judgment filed by Planar, asserting that: (1) there is no genuine issue of material fact that Planar acted willfully to support enhanced damages under the Patent Act; (2) Planar has not infringed the '331 Patent; (3) the '331 Patent is invalid; (4) Planar has not infringed the '978 Patent; and (5) the '978 Patent is invalid. Planar also moves to exclude the report and testimony of Mass's expert Peter Heuser, J.D., and portions of the report and testimony of Mass's expert J.E. Akin, Ph.D., P.E. The final motion before the Court is Mass's motion to exclude portions of the report and testimony of Planar's expert Raymond Yee, Ph.D., P.E.[1] For the following reasons, Planar's motions for summary judgment are denied, Planar's motion to exclude portions of the expert testimony of Dr. Akin is denied, Planar's motion to exclude the testimony of Mr. Heuser is granted in part and deferred in part, and Mass's motion to exclude portions of the testimony of Dr. Yee is denied.

## STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

---

[1] At oral argument, the Court denied the parties' respective evidentiary motions raised in their summary judgment briefs, denied Planar's motion to strike the expert report of Dr. J.E. Akin in its entirety, denied Planar's motion for summary judgment based on equitable estoppel, and denied Planar's motions based on the theory that Mass failed to present evidence of U.S. sales or disprove U.S. government sales. The Court reopened discovery for the limited purpose of obtaining evidence relating to Planar's U.S. sales (whether private or government).

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

## B. Expert Testimony

The United States Court of Appeals for the Ninth Circuit has discussed the standard under which a district court should consider the admissibility of expert testimony. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014). As explained by the Ninth Circuit:

> Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702.

> Under *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)] and its progeny, including *Daubert II* [*Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311 (9th Cir. 1995)], a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).

> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence

is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

The test of reliability is flexible. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc). The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *Id.; see also Primiano*, 598 F.3d at 564. But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted); *see also Barabin*, 740 F.3d at 463. The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 564-65. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Id.* at 1043-44 (case citation alterations added, remaining alterations in original).

"It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the expert's proposed testimony must be established by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10 (*citing Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)). The party presenting the expert must demonstrate that the expert's findings are based on sound principles and that they are capable of independent validation. *Daubert II*, 43 F.3d at 1316.

# BACKGROUND

In this section, the Court sets forth the background relating to the issuance of the patents-in-suit and this lawsuit. Further factual background is set forth in the Discussion section below, when relevant to a specific motion.

## A.  '978 Patent

Mass alleges infringement claims 16, 18, 25, and 27 of the '978 Patent. The '978 Patent is titled "Dual Display System" and describes a specific type of stand for two electronic "displays" (or "monitors"). It was filed on October 13, 1998, and issued on December 5, 2000. The '978 Patent is a reissue of U.S. Patent No. 5,687,939, which was filed on April 26, 1996, and issued on November 18, 1997. The '978 Patent was reexamined, and on May 10, 2011, an Ex Parte Reexamination Certificate issued, adding new claims 18-38. New claims 18-37 are dependent on either claim 16 or 17.

## B.  '331 Patent

Mass also alleges infringement of claims 1, 4, 10, and 18 of the '331 Patent. The '331 Patent is titled "Horizontal Three Screen LCD Display System" and describes a specific type of stand for at least two "displays" (or "monitors"). The '331 Patent was originally filed as non-provisional application No. 10/129,884, based on application No. PCT/IB00/01646, filed on November 13, 2000, which published on May 10, 2002 as PCT publication No. WO01/35197. It further claims priority to provisional application No. 60/165,047, filed on November 12, 1999. The '331 Patent was issued on January 24, 2012, after extensive prosecution.

## C.  Procedural History

On November 12, 2009, Mass sued Planar and others in the Eastern District of Texas, alleging infringement of the '978 patent (the "First Lawsuit"). Mass served its complaint on Planar on February 26, 2010. On August 2, 2012, after health issues arose relating to Mass's lead

counsel, Mass and Planar, among others, stipulated to the dismissal of the First Lawsuit without prejudice.

On May 2, 2014, Mass sued Planar and others in several lawsuits filed in the Eastern District of Texas, alleging infringement of both the '978 and the '331 patents. On November 10, 2014, the district court consolidated the actions for pretrial issues only, including claim construction. On March 24, 2015, the Eastern District of Texas granted in part Planar's motion to transfer venue to the District of Oregon, "effective the day the Court issues its claim construction opinion." ECF 24 at 1. The Eastern District of Texas issued its claim construction (*Markman*) decision on July 20, 2016. ECF 31. On July 26, 2016, the District of Oregon received the transfer of Mass's action against Planar. ECF 34; *see also* ECF 53 at 2.

## DISCUSSION

### A. Willfulness

"Section 284 of the Patent Act provides that, in a case of infringement, courts 'may increase the damages up to three times the amount found or assessed.'" *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1928 (2016) (quoting 35 U.S.C. § 284). "[T]here is no precise rule or formula for awarding damages under § 284." *Id.* at 1932 (quotation marks omitted). "The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* Such damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior" and "are generally reserved for egregious cases of culpable behavior." *Id.*

Whether infringement is "willful" is by definition a question of the infringer's intent, the answer to which must be inferred from all the circumstances. *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992); *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508,

510-11 (Fed. Cir. 1990); *see also Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1186

(9th Cir. 2016) ("A determination of willfulness requires an assessment of a defendant's state of

mind."). "Courts consider several factors when determining whether an infringer has acted in bad

faith and whether damages should be increased." *Liquid Dynamics Corp. v. Vaughan Co.,*

*Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006). They include:

> (1) whether the infringer deliberately copied the ideas or design of
> another; (2) whether the infringer, when he knew of the other's
> patent protection, investigated the scope of the patent and formed a
> good-faith belief that it was invalid or that it was not infringed; and
> (3) the infringer's behavior as a party to the litigation.

*Read Corp. v. Portec Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992), *superseded on other grounds as*

*recognized in Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).

Planar argues that there is no evidence that it acted in bad faith or engaged in willful,

wanton, malicious, deliberate, consciously wrongful, or flagrant conduct. HighGrade is the

manufacturer of the allegedly infringing products sold by Planar. At some point, Planar entered

into an indemnification agreement with HighGrade, in which HighGrade agreed to indemnify

Planar for any claims of patent infringement. Although no party provided a written copy of the

indemnification agreement to the Court, at oral argument, counsel for Planar represented that the

indemnification agreement was entered into in April 2008, before Mass filed the First Lawsuit

for patent infringement against Planar.

At Planar's Rule 30(b)(6) deposition of Mr. Stephen M. Going, Planar's former General

Counsel, Mr. Going testified that the separate indemnification agreement by HighGrade in favor

of Planar was "unique" and that generally with its suppliers Planar relied on its purchase order

standard terms and conditions, which included an indemnification clause. ECF 129-2 at 16.

Mr. Going did not know the specific circumstances under which the separate indemnification

agreement with HighGrade was executed. *Id.* at 17.

After Mass filed the suit and Planar became aware of the alleged infringement, Planar expressly stated that it was continuing to sell the allegedly infringing products in large part because it had an indemnification agreement with HighGrade. *See* ECF 129-3 at 19-20, 25, 26-27. Viewing the evidence in the light most favorable to Mass and drawing all reasonable inferences in favor of Mass, the Court finds the existence of the "unique" indemnification agreement with HighGrade and Planar's express reliance on that agreement to continue selling the allegedly infringing products after Planar was put on notice of the alleged infringement through the filing of the original lawsuit (for the '978 Patent) and this lawsuit (for the '331 Patent)  is sufficient to create a genuine issue of fact on the question of willfulness. *Cf. SynQor, Inc. v. Artesyn Techs., Inc.*, 2013 WL 12084744, at *12 (E.D. Tex. July 19, 2013), *report and recommendation adopted*, 2013 WL 12085171 (E.D. Tex. July 29, 2013) (finding, in the context of willful blindness, that the fact that the defendants refused to continue sales until they entered into an indemnification agreement "tips the scale in creating a genuine issue of material fact as to whether Defendants' were willfully blind" as to the patent infringement because the defendants were "protecting [their] own financial interest by entering into indemnification agreements shielding [them] from liability").

Planar also argues that because Mass did not move for a preliminary injunction and because Planar did not have knowledge of the patents-in-suit before this lawsuit was filed, Mass cannot exclusively rely on post-filing conduct for willfulness, citing to *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007). This argument fails for three reasons. First, Mass had knowledge of the '978 Patent before this lawsuit, from the previously-filed lawsuit against Planar involving the '978 Patent. Second, Mass is not exclusively relying on post-suit conduct, because the indemnification agreement entered-into between HighGrade and Mass occurred

before this litigation. Third, the Federal Circuit has explained that seeking a preliminary injunction is not required for a patentee to rely on post-filing conduct. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295-96 (Fed. Cir. 2017) (finding that the district court "erred in concluding that Synopsys could not present evidence of post-filing willful infringement because Synopsys did not seek a preliminary injunction" because "there is 'no rigid rule' that a patentee must seek a preliminary injunction in order to seek enhanced damages").

## B. Noninfringement of the '331 Patent

Planar argues that Mass fails to provide evidence showing a genuine issue of fact that Planar directly infringed the '331 Patent because many elements of the asserted claims, or claims on which the asserted claims depend, are not present. These elements include aspects of the support arms, connections to the monitors, and support column placement. Planar also notes that a number of the accused products are not sold with any monitors. Planar argues that there is insufficient evidence showing that Planar has assembled the accused products with at least two monitors and that the '331 Patent requires at least two displays for a product to infringe.

Regarding indirect infringement, Planar similarly argues that there is insufficient evidence that any end user assembled the products with at least two monitors. For contributory infringement, Planar also argues that there are substantial noninfringing uses of the accused products and thus no contributory infringement.

### 1. The Accused Products that Do Not Include Monitors

Some of the accused products are sold without monitors. Planar argues that Mass provides insufficient evidence relating to those products that Planar or end users assemble them with at least two displays, as required by the '331 Patent. Mass responds that inclusion of monitors is not required by the asserted claims of the '331 Patent, and that only the presence of connectors that serve the purpose of connecting monitors is required. Mass further responds that

if inclusion of monitors is required, assembly by Planar is not required because a manufacturer cannot avoid liability by selling infringing products unassembled. Mass also asserts that there is sufficient evidence that the accused products are capable of infringing, are assembled in an infringing manner by Planar and end users, and are necessarily infringing.

The Court agrees that Claims 1 and 9[2] do not require that monitors be attached. *See* Section B.3 below. Moreover, even if the presence of monitors is required, the Court agrees with Mass that there is sufficient evidence to create an issue of fact for the jury on infringement by Planar and end users.

"[T]he patent laws do not allow a manufacturer to avoid infringement simply by selling a dissembled device that would infringe on assembly." *EBS Automotive Servs. v. Ill. Tool Works, Inc.*, 2011 WL 4021323, at *5 (S.D. Cal. Sept. 12, 2011); *see also High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995). Planar argues that the devices do not infringe because they might not be assembled attached to two monitors. Planar relies on *ACCO Brands, Inc. v. ABA Locks Manufacturer Co.* to argue that Mass must prove either (1) specific instances of infringement, or (2) that Planar's accused products sold without monitors "necessarily infringe." 501 F.3d 1307, 1313 (Fed. Cir. 2007).

The Court finds the facts of the pending case are more similar to *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012), and *Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), than to *ACCO*, and is persuaded by how the Federal Circuit distinguished *ACCO* in those cases. In *Toshiba*, the Federal Circuit found sufficient evidence to preclude summary judgment because the manufacturer "designed the DVDs to be used in an infringing way and instructed users to use them in the infringing way by finalizing the DVDs or

_____

[2] Although Claim 9 is not asserted, Claim 10, which is asserted, is dependent on Claim 9.

using the disc-at-once mode." *Toshiba*, 681 F.3d at 1365. The court noted that it was "not the

first time we have concluded that where an alleged infringer designs a product for use in an

infringing way and instructs users to use the product in an infringing way, there is sufficient

evidence for a jury to find direct infringement." *Id.* (citing, by way of example, *Lucent*). The

court distinguished *ACCO* on the ground that the products in that case were sold only with

instructions describing noninfringing use and the only other evidence relied upon by the patentee

"was its expert testimony that the infringing mode was the 'natural and intuitive way' to operate

the device," although the "expert 'had no opinion' on whether others used the device in an

infringing mode." *Id.* at 1366 (quoting *ACCO*, 501 F.3d at 1313).

Similarly, in *Lucent*, the Federal Circuit found circumstantial evidence sufficient to

uphold the jury's verdict where the products were designed to practice the claimed invention and

sold with instructions on how to use the products in an infringing way. *Lucent*, 580 F.3d at 1318.

Further, the patentee's expert opined that he and his wife used the product in an infringing way

and that he found it "hard to imagine that we're the only two people in the world that ever used

it" in that manner. *Id.* The court also distinguished *ACCO* because in *Lucent* the products were

sold with instructions on how to infringe and because the expert provided more support that

persons other than the expert used the product in an infringing manner.

Here, the accused products have connectors that are for the purpose of connecting at least

two monitors. Planar instructs end users on how to assemble the products connected to at least

two monitors. *See, e.g.*, ECF 90-2 through 90-5, 141-1, 141-2, 141-4, 141-5, 141-13. Planar

tested its products attached to two monitors and created technical specifications anticipating

attaching the products to at least two monitors. *See* ECF 141-6 through 141-10. Planar posted

images in its brochures, instruction manuals, and on its website of the accused products with two

monitors attached. *See* ECF 90-2 through 90-5, 141-1, 141-2, 141-4, 141-5, 141-13. Planar

admits that it entered into the business of selling dual monitor stands because it sells monitors

and it "was logical" that people "may want to mount more than one monitor in front of them."

ECF 141-15 at 79 (Tr. 80:13-24). Indeed, Planar sells bundles containing stands with monitors at

a discount to encourage the sale of more monitors. *Id.* at 88-89 (Tr. 89:23-90:3). Moreover,

Mass's expert Dr. Akin opined that the products have no substantial use other than to support

multiple monitors. *See, e.g.*, ECF 104-1 at 18, 26. Under *Toshiba* and *Lucent*, this evidence is

sufficient to create an issue of fact for the jury on direct infringement, including direct

infringement necessary as the underlying basis for the alleged indirect infringement.

Even if the Court were to apply *ACCO*, the record evidence is sufficient to create an issue

of fact as to both specific instances of infringement and necessary infringement. Mass submitted

images from Planar's website showing the accused products with monitors attached. Planar

argues that those products could have been assembled in Taiwan, but at summary judgment all

reasonable inferences are drawn in favor of the non-moving party. The Court finds it to be a

reasonable inference that images on Planar's website of products sold by Planar in the United

States reflect products that were assembled in the United States. This is sufficient to show a

specific instance of direct infringement by Planar.

Relating to infringement by an end user, Mass submitted images from retail websites and

from user reviews discussing Planar's products and how they work with multiple monitors.

Again, viewing the evidence in the light most favorable to Mass and drawing all reasonable

inferences in favor of Mass, this is sufficient to create an issue of fact of specific instances of

infringement by end users in the United States.

Moreover, even if there was insufficient evidence of specific instances of infringement, there is sufficient evidence to create an issue of fact as to whether Planar's accused products necessarily infringe. Planar argues that its asserted noninfringing use (a user not mounting two monitors) is neither speculative nor illusory. In light of Planar's admissions that its purpose in selling these stands is to meet the end user's desire to mount multiple monitors, Mass's expert testimony that there is no substantial use other than to mount multiple monitors, and the fact that there is no point in purchasing a dual monitor stand to only mount a single monitor (or no monitor), the Court finds that there is at least an issue of fact regarding whether the accused porducts necessarily infringe.

### 2. The Accused Products' Support Arms

Planar makes five arguments as to why the support arms in the accused products do not meet the claim limitations. First, Planar argues that the support arms are two separate pieces and thus are not an "integral arm." Second, if they are not an integral arm, they must be measured separately and thus not longer than the width of the base. Third, if they are not an integral arm, they do not support the two displays, but instead each supports only one display. Fourth, if they are not an integral arm, they do not extend on both sides of the support column. Finally, they do not "tend to wrap around the user," but instead have a configuration where they can be in a straight line.

Because the first four arguments all depend on whether the support arms are an "integral arm," the Court first considers that issue. In claim construction, the Eastern District of Texas construed the term "a single piece support arm" in claim 1 as "an integral arm extending on both sides of the support column." The term "a support arm" in claim 9 was construed with the word "arm" to mean one arm extending on both sides of the support column, and the remaining terms to have their plain and ordinary meaning. In construing these terms, the court rejected Planar's

argument that the patent applicant disclaimed multiple piece support arms or multiple single piece support arms in the prosecution history, concluding that "[t]he prosecution history does not support limiting a 'single piece support arm' to one that is 'formed' as a single piece." ECF 31 at 23.

Planar now argues that its support arms cannot infringe because they come in two pieces and thus cannot be a single piece support arm. First, the Court analyzes the term as it was construed in claim construction and thus considers whether the support arms of the accused products are an "integral arm." Second, as the Court previously explained, it does not intend to reconsider claim construction at this stage. Thus, the Court declines to adopt Planar's renewed argument that to be an "integral arm" requires the arm be formed as a single piece.

The dictionary defines "integral" as, among other definitions: "of, relating to, or serving to form a whole"; "formed as a unit with another part (as the main part)"; "*composed of constituent parts making a whole.*" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1173 (unabridged ed. 2002) (emphasis added). Thus, two separate pieces can constitute an integral arm, if they form together as a unit, perhaps with other constituent parts, to form a whole arm.

 The accused products come with two separate arm pieces. Those pieces have a notch-and-groove composition that allows them to fit securely when they are placed directly on top of one another and locked in place on the support column with the locking mechanism. Apart from the support column and the locking mechanism, however, the two arm pieces will not stay together using just the notch-and-groove elements.

The majority of the photographs, instructions, technical specification sheets, and manuals in the record show the two arm pieces being locked together on the support column using the notch-and-groove connection so that they form a single arm that extends on both sides of the

support column. In this configuration, they come together to form one whole—an "integral" arm. Some of the instruction sheets, however, include at least one photograph where the two arm pieces are not locked onto one another forming one long arm. Instead, they are offset so that one monitor could be placed higher than another. In such a configuration, they are not an integral arm, and appear to be two separate support arms.

Mass argues that placing the monitor stands in this offset position renders the stands unstable and would cause the monitors to fall over, citing to the testimony of Dr. Akin. Planar responds that the referenced testimony of Dr. Akin relates to a hypothetical redesign, does not relate to the accused products, and therefore is irrelevant. Although the specific testimony of Dr. Akin regarding this instability relates to a hypothetical redesign, that redesign eliminates what the Court is describing as the notch-and-groove design element. The point of Dr. Akin's testimony is that when the two arm pieces are not locked together using the notch-and-groove elements, thereby creating one integral arm, the stands will be unstable after monitors are added. This testimony is just as applicable to the accused products being assembled without taking advantage of the notch-and-groove design element, by separating the two arm pieces, as it is to a hypothetical redesign that eliminates the notch-and-groove design element altogether. Accordingly, the Court considers this testimony and finds that it is sufficient to create an issue of fact as to whether there is a noninfringing configuration that is more than speculative or illusory.

Moreover, even if Dr. Akin's testimony did not apply and there were a possible noninfringing configuration where the arms were separate, that fact would not mean that the support arm is not an "integral arm" for purposes of summary judgment. The preferred use of the support arm is when the two pieces are locked together as one single arm, which is demonstrated by the fact that most of the images, instructions, and testing are all based on this configuration.

The presence of a possible noninfringing configuration does not preclude this issue from going to the jury. *See Toshiba*, 681 F.3d at 1365; *Lucent*, 580 F.3d at 1318. Because the Court has found that there is a configuration in which the support arms of the accused products constitute an "integral arm," the Court rejects Planar's related arguments that the support arms are not longer than the width of the base, do not extend to both sides of the support column, and do not support the at least two displays.

### 3. The Requirement of Connectors at the Back

Planar argues that the accused products that are sold without monitors do not meet the requirement in Claims 1 and 9 that the products have "at least two connectors for connecting display housing portions at the backs of at least two displays" because no monitors are attached. The Court finds this argument without merit. This claim specification does not require that the two monitors be attached, but requires only that there be two connectors *for* connecting display housing portions at the backs of at least two displays. The word "for" provides functional limitations that describe capabilities, and thus the claim only requires that than an accused product possess the capability of performing the recited function. *See Finjan, Inc. v. Secure Computing Corp*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010); *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369-70 (Fed. Cir. 2009). The accused products are capable of attaching to two monitors.

Moreover, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Claim 2 of the '331 Patent is directed to "[t]he display system of claim 1, further comprising the at least two displays." ECF 90-1 at 12. Thus, Claim 2 is the claim that includes the displays themselves, which gives rise to a presumption that Claims 1 and 9 do not.

#### 4. Placement of the Support Column

Planar argues that the accused products do not infringe because the '331 Patent requires that the support column be directly behind "the at least two displays." The Court disagrees and finds that "behind" has its plain and ordinary meaning and means "behind the plane where the monitors are sitting." It is nonsensical to argue that a relatively small, vertical support column must physically be located directly behind more than one monitor.

Additionally, the Court notes that under Planar's definition, the '331 Patent itself would not comply. The Patent's own figures show as much. Figure 1 shows a configuration where only one monitor is directly in front of the support column. Figures 2 through 5 show configurations where after monitors are attached, depending on their size, none of them may be directly in front of the support column (meaning the support column is not directly behind any monitor). Based on the Court's plain and ordinary definition of "behind," there is an issue of fact whether Planar's accused products infringe.

#### 5. Noninfringing Configurations

Planar argues that because there are some configurations that do not infringe, including configurations where the support arms are not integral, do not support both monitors, do not extend to both sides of the support column, and are not wrapping around the user, and where the support column is not behind the two displays, the accused products do not infringe. The Court again follows *Toshiba* and *Lucent* and finds that because there are infringing configurations that are manufactured and instructed by Planar, along with expert testimony supporting that the infringing configurations are the only substantial use of the accused products, there is sufficient evidence to create an issue of fact for the jury on infringement. *See Toshiba*, 681 F.3d at 1365; *Lucent*, 580 F.3d at 1318. Further, as discussed above, even if the Court followed *ACCO*, there is

sufficient evidence to create a genuine issue of fact on specific instances of infringement and whether the accused products necessarily infringe.

### 6. Contributory Infringement and Purported Substantial Noninfringing Use

Planar relies on the noninfringing configurations of its accused products to argue that there are substantial noninfringing uses of the accused devices and thus summary judgment should be granted on Mass's contributory infringement claim. The noninfringing configurations depend upon the support arms being separated from one another. As discussed above, the testimony of Dr. Akin creates an issue of fact as to whether this purported noninfringing configuration is illusory. Accordingly, summary judgment on contributory infringement based on substantial noninfringing use is denied.

## C. Invalidity of the '331 Patent

### 1. Written Description

Compliance with the written description requirement is a question of fact, and the issue is only "amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1353 (Fed. Cir. 2011) (quotation marks omitted). The test "is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). New claims filed after the original application filing date must find support in the original specification. *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. GE*, 264 F.3d 1111, 1118 (Fed. Cir. 2001).

Planar argues that the term "at least a part of the support column is disposed behind the at least two displays" was not part of the original '331 Patent application and that the original patent specification does not include any disclosure suggesting that the support column is

disposed behind two displays. Planar asserts that the only figure showing the support column behind a display is Figure 1, which shows the support column behind only one display.

Planar's argument primarily is based on Planar's misinterpretation of the term "disposed behind," as discussed above. Planar contends that it means that the support column must be positioned directly behind at least two displays. The Court has already concluded that the term has its plain and ordinary meaning that the support column must only be behind the plane in which the monitors sit, and not directly behind at least two monitors. Thus, Planar's argument that Figure 1 of the original patent is insufficient disclosure because it shows the support column behind only one monitor is rejected. The support column as disclosed in Figure 1 is directly behind only one monitor, but it is behind the plane of all three monitors in the figure. Thus Figure 1 is sufficient disclosure given how the Court has interpreted the term "disposed behind the at least two displays." *See Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 866 (Fed. Cir. 1993) ("It is also clear that 'drawings alone may provide a 'written description' of an invention as required by § 112.'" (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1565 (Fed. Cir. 1991)). The Court finds there is sufficient evidence that this term was disclosed in the original application for the question to go to the jury and does not find that no reasonable juror could find for Mass. *Atl. Research*, 659 F.3d at 1353.

### 2. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Planar argues that the '331 Patent is indefinite because Claims 1 and 9 require a support arm "that has a longitudinal length that is longer than the width of the base." Planar argues that a person of ordinary skill in the art (a "POSITA") cannot understand with

reasonable certainty what measurement the "width" is referencing and what component parts constitute the "base" that is supposed to be measured. Planar asserts that the "width" can be measured from side-to-side or from front-to-back, using by way of example an empty box or a blank piece of paper. Planar argues as an example that the width of a piece of paper can be the 11-inch side or the 8.5-inch side.

Planar's argument that how to measure the "width" of the base is uncertain is unpersuasive. An empty box or a blank piece of paper does not have a point of reference to orient the user to ascertain its width. Thus, the width changes based on the orientation of the box or paper as it is being used in the particular instance for which it is being measured. *Cf.* ECF 132 at 6 (Akin Decl. ¶ 16). The patented products (and Planar's accused products), in contrast, do have a point of orientation. The stands hold monitors and face a user, who is positioned in front of a stand and its monitors. Width would be measured in this mode of operation. The plain and ordinary meaning of "width" in this context is side-to-side. The depth of the stand would be front-to-back. A POSITA would understand that the width of the base is the side-to-side dimension of the base from this perspective. *See id.* at 5-6 (Akin Decl. ¶¶ 11-15). The fact that the specification describes the arm as having a "longitudinal length" does not render the width of the base unreasonably uncertain. *See id.* at 7 (Akin Decl. ¶ 18).

Planar's argument that what parts constitute the base also is without merit. Planar argues that it is unclear what structures are included in the base, including whether "feet 28" and other specific structures are part of the base. The patent, however, describes that "base 22 *includes* a pair of feet 28." ECF 90-1 at 11 ('331 Patent at 3:13-14) (emphasis added); *see also* ECF 132 at 4 (Akin Decl. ¶ 9). It also describes the other structures as being part of the base in its text and figures. *See* ECF 132 at 4-5 (Akin Decl. ¶ 4). Thus, a POSITA would understand to measure the

fully inclusive parts of the base in order to determine the base's width. The Court finds that the references to the width of the base in Claims 1 and 9 of the '331 Patent are sufficiently clear for a person skilled in the art to understand with reasonable certainty what is being referenced and how to measure it.

**D.  Noninfringement of the '978 Patent**

Planar argues that it did not directly or indirectly infringe the '978 patent by selling the accused products that are not sold with monitors because "a pair of electronic displays" is required under the patent. Unlike with the '331 Patent, Mass does not dispute that a pair of electronic displays is required for the asserted claims in the '978 Patent. Mass argues, however, that there is sufficient evidence to create an issue of fact that Planar and end users assemble the products with a pair of monitors. For the same reasons the Court rejects Planar's argument relating to the '331 Patent that there is insufficient evidence that the stands were assembled with two monitors, the Court denies this motion. The testimony of Dr. Akin that these products have no substantial use other than to attach multiple monitors, the Rule 30(b)(6) testimony of Planar that the purpose of selling these stands is to hold multiple monitors, the images on Planar's website and instruction manuals showing the products holding two monitors, and the evidence from retail and other websites of users' reviewing these products as used with two monitors and posting images of them is sufficient to create an issue of fact that Planar and end users assemble the product with two monitors.

Planar also argues that the circumstantial evidence of infringement provided by Mass is insufficient. As discussed in resolving Planar's motion for summary judgment arguing noninfringement of the '331 Patent, the Court relies on *Toshiba* and *Lucent* to find sufficient evidence to create an issue of fact for both direct and indirect infringement. Further, even if the

Court were to apply *ACCO*, there is sufficient evidence in the record to create an issue of fact on specific instances and necessary infringement.

**E. Invalidity of the '978 Patent**

    **1. Indefiniteness**

Planar argues that the '978 Patent is indefinite because Claim 16 requires a "mounting means comprising means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit said displays to be angled toward each other to a desired degree" and Claim 17 has nearly the same limitation, requiring a "means for adjusting the angular orientation of each of the displays relative to the arm assembly about a generally vertical axis to thereby permit said displays to be angled relative to each other to a desired degree." ECF 89-1 at 16. Planar argues that "to a desired degree" is based on the subjective intent of the end user and fails to inform POSITA with reasonable certainty of the scope of the claimed limitation relating to the angular adjustment of the displays. In other words, Planar argues that how much a user wants to adjust the monitors toward each other or relative to each other is unclear.

Mass previously sued other defendants for violating the '978 Patent by selling monitor stands for multiple monitors. Among other defenses, those defendants argued that the term "to a desired degree" in these same claims was indefinite. *See Mass Eng'd Design, Inc. v. Ergotron, Inc.*, 559 F. Supp. 2d 740, 751 (E.D. Tex. 2008) (*Ergotron I*). The Eastern District of Texas discussed this issue as follows:

> "Desired degree" must be considered in the context of the claim language. The term is used in Claims 16 and 17 and relates to how far the displays may be angled toward or relative to each other. The context relates to adjusting or angling the displays, and this context helps to suggest a meaningful definition for desired degree.
>
> It is important to note that using the word "desired" does not make

the phrase per se indefinite. Although a term requires a user's foreknowledge of certain facts, this does not make the term indefinite as long as the term can be objectively verified. *Datamize* [*v. Plumtree Software, Inc.*], 417 F.3d [1342,] 1355-56 [(Fed. Cir. 2005)] (finding that the term " 'desired,' which requires foreknowledge and even intent on the part of the person practicing the invention" did not make the claim indefinite.)

The use of the term "desired degree" is objectively verifiable. Viewed in context of the claim, the phrase is directed at adjusting the displays to preferred viewing angles. Defendants focus on the actual range of the degrees claimed by the '978 patent, contending that one range of degrees might lead to infringement while another range may not. However, this argument is a nonstarter. Neither claim 16 nor 17 are directed at limiting the apparatus to a certain range of angling; rather the claim language focuses on whether the apparatus allows the user to adjust the angular orientation of the display. One of ordinary skill in the art would understand that users' preferences would vary depending on the circumstances. For example, viewers' preferences may change depending on certain facts such as glare and seat height. Thus, the inventor is not required to limit the angle adjustment to a particular range of degrees. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1575-76 (holding that the term "so dimensioned" was not indefinite as it was as specific as the facts allowed).

Although "desired degree" requires foreknowledge on the part of the user, the resulting adjustment is objectively verifiable. The term "degree" is used in a mathematical sense; thus, it is confined to a lower limit of zero degrees and an upper limit of 360 degrees. Due to the mathematical nature, the resulting adjustment can be verified. Therefore, the term is not indefinite, and the Court DENIES Defendants' Motion for Summary Judgment.

*Id.* at 751-52 (some citations omitted) (emphasis in original), *opinion clarified on other grounds by*, 2008 WL 2697293 (E.D. Tex. May 30, 2008), and *amended on other grounds by*, 2008 WL 3483906 (E.D. Tex. Aug. 7, 2008). The Court agrees with the analysis of the Eastern District of Texas and finds that this analysis, grounded in *Datamize's* requirement of objective verifiability (which was not changed by *Nautilus*), was not rendered erroneous based on the Supreme Court's subsequent decision in *Nautilus*.

Planar argues that the Eastern District of Texas was incorrect in noting that the term "degree" has a mathematical sense and is thus confined to a lower limit of zero degrees and an upper limit of 360 degrees, because zero degrees is not turning at all and beyond 90 degrees the monitors would no longer be turning toward each other but would be turning away from each other. The Court agrees that as used to describe the degree to which the monitors are turning toward each other, the limitations of zero to 360 degrees do not apply. Planar, however, misunderstands the *Ergotron I* opinion. The Eastern District of Texas was using zero to 360 degrees in a general sense to describe mathematical minimum and maximum possible degrees of rotation, and not precisely what degrees the monitors could rotate as described in the '978 Patent. This is because in *Ergotron I* the court found that Claims 16 and 17 did not include any limitation on the precise angle of rotation, but merely claim a general limitation on the *ability* of the monitors to angle toward or relative to each other. The Court agrees.

The limitation in both claims is for a *mounting means* that includes the *means for* adjusting the monitors to the user's desired degree. The claims do not describe limitations on the specific angles of adjustment. They only require that the product contain a means for adjusting the monitors toward or relative to each other to one or more desired degrees. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (noting that the Federal Circuit has "repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more'"). The "desired degree" part merely explains that at any given time the amount of adjustment will vary based on user preference at that moment.

The Court also rejects Planar's argument that the Court in *Ergotron I* erroneously found that the ability of the monitors to adjust was objectively verifiable and was not wholly within the subjective desire of the end user. The ability to adjust to a specific degree is not required by the

claim limitation. It is objectively verifiable whether a product can adjust the monitors toward or relative to each other. *See* ECF 126-10 at 66-68 (Akin Rebuttal Report).

Furthermore, even if objective verification of a specific range of adjustability were required, a POSITA looking at the claim language would understand that the end user could only adjust the monitors to a "desired degree" that is feasibly allowed by the patented device. There are physical limitations to the structures of the patented device. The "desire" of the user is not in a vacuum. It is constrained by what is physically possible with the device.[3] *See id.* To the extent Planar contends otherwise, this is an issue for the jury.

### 2. Written Description

Planar also argues that the '978 Patent is invalid because the specification that a user could adjust the monitors to "a desired degree" was added after the original application and was not sufficiently disclosed in the original application. This same argument was previously rejected by the Eastern District of Texas in *Mass Eng'd Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 375-76 (E.D. Tex. 2009) (*Ergotron II*). The court in *Egrotron II* found that the limitation was adequately disclosed because Figures 4 and 20 of the original application disclosed the ability of the monitors to angle towards each other. *Id.* Planar argues that the court in *Egrotron II* incorrectly decided the issue because those figures merely disclose that the monitors can be adjusted toward each other, and do not disclose that they can be adjusted to the desired degree of a user.

As with Planar's written description argument on the '331 Patent, its argument here is based on its misunderstanding of the claim limitation term. The Court holds, as did the Eastern District of Texas in the *Ergotron* case, that the claim limitations containing the term "a desired

---

[3] It also more broadly constrained by what is mathematically possible in rotation, which is what the Eastern District of Texas noted.

degree" do not limit the adjustment of the monitors to any particular degree or angle, but merely require that the apparatus have the ability to adjust the monitors toward or relative to each other to some degree, and that degree will vary at any given time based on user preference. Thus, the particular angle of the user's preference did not have to be disclosed in the original application. What needed to be disclosed was the means to adjust the monitors toward each other at some angle that the user will prefer. The Court agrees with the conclusion by the court in *Ergotron II*, not disputed by Planar, that Figures 4 and 20 of the original application disclosed the ability of the monitors to angle toward each other. Thus, the Court cannot conclude that "no reasonable fact finder could return a verdict for [Mass]." *Atl. Research*, 659 F.3d at 1353.

### 3. Original Patent

Planar argues that when the '978 Patent was reissued, it did not meet the requirements of 35 U.S.C. § 251 because the limitation "to thereby permit said displays to be angled toward [(or relative to)] each other to a desired degree" is not found clearly and unequivocally as a separate invention in the specification of the original patent. "Whether the statutory requirements of 35 U.S.C. § 251 have been met is a question of law. This legal conclusion can involve underlying factual questions." *Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472, 1479 (Fed. Cir. 1998) (citation omitted). The Supreme Court holds that "it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original." *U. S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 676 (1942). Thus, "the specification must clearly and unequivocally disclose the newly claimed invention as a separate invention." *Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354, 1362 (Fed. Cir. 2014).

Planar's argument is again based on its misunderstanding of the term "to a desired degree." For the same reasons the Court finds that Planar's written description argument fails, the Court finds that this argument fails.

## F. Expert Testimony of Peter Heuser

Planar challenges the entirety of the expert opinion of Peter Heuser and moves under *Daubert* to exclude his testimony. Mr. Heuser is an attorney, who practices in the field of intellectual property. He has both tried cases and filed patent applications. In his expert report, Mr. Heuser summarizes the legal test applicable to determining whether a patent infringement is willful and thus subject to enhanced damages under 35 U.S.C. § 284. ECF 99-1 at 10-14. Mr. Heuser then recites facts that he contends are "pertinent" to the issue of willful infringement. *Id.* at 14-19. Next, Mr. Heuser provides his analysis for why Planar's alleged willful infringement was "sufficiently egregious to justify enhanced damages." In this section of his expert report, Mr. Heuser applies the facts recited in the light most favorable to Mass to the legal test that he has described and offers guidance regarding "[h]ow the Court should decide on the amount of enhancement." *Id.* at 19-26.

With two exceptions, Mr. Heuser's expert opinion reads largely like a legal memorandum in opposition to Planar's motion for summary judgment. In that motion, Planar asks the Court to find no willful infringement as a matter of law. ECF 100. For the reasons discussed earlier in this Opinion and Order, the Court denies Planar's motion for summary judgment regarding willful infringement. Because his report reads more like a legal memorandum to the Court, Mr. Heuser's expert scientific, technical, or other specialized knowledge will not help the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a). But for two exceptions, there are no expressions of expert opinion that would be helpful to the trier of fact. The exceptions are Mr. Heuser's opinions that the Trop opinion given to Planar's supplier

HighGrade is "superficial" and that Planar improperly relied on HighGrade's oral representation of the existence of a non-infringement opinion without seeing and evaluating the written opinion.

As previously noted, Mass first sued Planar, and others in November 2009 in the Eastern District of Texas, alleging infringement of the '978 patent. That was the First Lawsuit. Approximately one year later, on February 22, 2011, attorney Tim Trop provided a written non-infringement opinion to HighGrade. At some point thereafter, HighGrade orally informed Planar about the existence of this non-infringement opinion but declined to provide Planar with a copy. During discovery in the pending lawsuit, a copy of that written opinion has been obtained. *See* ECF 121-6. Mr. Heuser has reviewed that written opinion and offers his expert opinion that "even if Planar had seen or relied upon the Trop opinion, its analysis is superficial." ECF 99-1 at 16. Mr. Heuser also notes that oral opinions carry less weight and that without obtaining a copy of the written opinion it would be "impossible" for Planar to know if a correction to the opinion was necessary based on court claim construction and that "Planar should have demanded to see the written opinion." *Id.* at 21.

Planar states that it has not yet decided whether it will rely at trial on its knowledge of the existence of Mr. Trop's non-infringement opinion, even though Planar concedes that it never saw a copy of that written opinion before this litigation. Planar argues that if it decides not to rely on its knowledge of that opinion, in other words, if it decides not to assert an advice of counsel defense, then 35 U.S.C. § 298 will preclude Mass from arguing that Planar improperly failed to obtain the advice of counsel, or failed to obtain advice that was not superficial.[4] In that event, according to Planar, nothing in Mr. Heuser's report will be helpful to a trier of fact.

---

[4] Section 298 provides: "The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to

The parties disagree over the application of § 298, and the Court will not resolve that dispute at this time. Instead, this is a matter better saved for a motion *in limine* before trial. If based on Planar's pretrial filings it becomes apparent that Planar will present, or if Planar presents at trial, a defense of advice of counsel and introduces evidence that it had received oral notice of Mr. Trop's non-infringement opinion, then Mr. Heuser's expert opinion that Mr. Trop's non-infringement opinion was "superficial" or that Planar improperly relied on the oral representation of the existence of Mr. Trop's opinion, may be relevant to rebut Planar's defense.

Whether these limited aspects of Mr. Heuser's expert opinion are admissible may depend upon context and timing. Accordingly, the Court will not rule on that question now. Instead, this issue is reserved for the pretrial conference if an appropriate motion *in limine* is filed or otherwise for trial. Other than that, however, nothing else in Mr. Heuser's expert report is helpful to the trier of fact. To that extent, Planar's motion to exclude Mr. Heuser's expert report and testimony is granted in part and deferred in part.

**G. Expert Testimony of Dr. J.E. Akin**

Planar challenges several aspects of the expert opinion of Dr. Akin as being insufficient under *Daubert*. First, Planar argues that Dr. Akin's testimony regarding the equivalent structures is deceptive. Second, Planar argues that Dr. Akin's opinions contain assumptions not based on facts or data. Next, Planar argues that Dr. Akin should be precluded from testifying about the benefits of the asserted patents and the value of the patents based on those benefits. Finally,

---

the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent." 35 U.S.C. § 298.

Planar argues that Dr. Akin should be precluded from testifying that the accused products infringe under the doctrine of equivalents.[5] Each argument is addressed in turn.

### 1. Equivalent Structures

Dr. Akin testified that certain structures in Planar's products are equivalent to structures in Mass's patented products, as that term is used in 35 U.S.C. § 112(f). Dr. Akin opined regarding how the structures in the accused products are "kinematically equivalent" and why they are the means for performing the same function in the same way as the structures in the patented products. Dr. Akin expressly noted in his § 112(f) equivalence analysis that he focused on the time the patent was issued and not at the time of infringement.

Planar originally asserted that this testimony is inadmissible because it focused on the time of issuance, and should have focused on the time of infringement. Mass pointed out that Dr. Akin applied the correct legal standard. *See Ring & Pinion Serv. Inc. v. ARB Corp.*, 743 F.3d 831, 835 (Fed. Cir. 2014) ("Equivalence under section 112(f) is evaluated at the time of issuance."). Planar then conceded this point, but now argues that nonetheless Dr. Akin's testimony is "deceptive" because after the patent was issued new scientific evidence was discovered that renders the structures no longer equivalent.

This dispute revolves around Dr. Akin's testimony that the "compound joint" in Planar's accused products "is just a sub-set of, and substantially the same as, including kinematically equivalent to, the ball joints in the cited '978 structures." ECF 104-5 at 8. Planar asserts that Dr. Yee confirms that two scientific papers, one in 2003 and one in 2005, show that Planar's compound joint is no longer considered equivalent to Mass's compound joint because such

---

[5] At oral argument, the Court noted that the parties appeared to reach agreement that Dr. Akin would not testify regarding Planar's state of mind, and to the extent that was not correct it could be handled through a motion *in limine*. Additionally, Planar withdrew its objection to Dr. Akin's testimony regarding the ultimate legal issue of infringement.

equivalence requires the intersection of three axes at a common point. Planar contends that this is a "very rare" situation where an equivalent at the time of issuance has been "proven" not to be equivalent prior to infringement. Planar argues that Dr. Akin "feigned ignorance" of this later change in scientific understanding and that Dr. Akin must have intended to "deceive the Court and Planar in hopes that the expert that Planar retained would not be sophisticated enough to catch Dr. Akin's deception." Planar's hyperbole aside, the record does not support that Dr. Akin intended to "deceive" the Court or that his opinion of equivalence has been "proven" not to be equivalent.

First, Dr. Akin expressly cited to the 2003 article that Planar asserts he "feigned ignorance" of and "ignored," demonstrating that he did not ignore that article. Although in its opening brief Planar acknowledges this fact, albeit criticizing Dr. Akin for "citing" it but not "relying" on it, in its reply brief Planar ignores this fact.[6] Regardless, even if Dr. Akin had ignored the two articles that were published after the issuance of the patent, it would go to the weight of his testimony, not its admissibility.

Second, Planar offers no authority for the proposition that even though Dr. Akin was required to consider equivalency for purposes of § 112(f) at the time of patent issuance, and did so, his opinion must be excluded as a matter of law because two scientific articles were later published that may cast doubt on his equivalency analysis. Planar may argue to the jury that these later articles diminish Dr. Akin's testimony, but the Court declines to hold that they render his testimony inadmissible.

---

[6] Indeed, in its reply brief Planar expresses surprise that Dr. Akin indicated in his Declaration that he knew about the 2003 article, despite the fact that Dr. Akin cited to the 2003 article in his expert report and that Planar expressly noted this fact in its opening brief.

Third, Mass and Dr. Akin dispute Planar and Dr. Yee's interpretation of the "kinematic equivalence" or lack thereof of the products and interpretation of the articles. This essentially comes down to experts having different opinions, and each side will have the opportunity to cross examine the other's experts. Planar's objections to Dr. Akin's testimony go to its weight, not its admissibility. Accordingly, the Court overrules Planar's objections to Dr. Akin's testimony regarding the equivalence of Planar's compound joint to Mass's ball joints.

### 2. Testimony Purportedly Based on Assumptions

A portion of this section of Planar's motion is based on its argument relating to the lack of evidence of U.S. sales. That portion was denied without prejudice at oral argument. The remaining portion of this section of Planar's motion argues that Dr. Akin impermissibly assumes that persons assemble the accused products with monitors. This objection goes to the weight, not admissibility, of Dr. Akin's testimony. Moreover, the Court finds that it is a reasonable assumption, based on all the evidence in the record.

Planar also argues that Dr. Akin impermissibly assumes that end users assemble the products in an infringing configuration. Dr. Akin testified that based on the admissions of Planar's Rule 30(b)(6) witnesses, the instruction manuals and technical specification sheets, the hardware that comes with the products, and the products themselves, the products are intended to hold multiple monitors and the infringing configuration is the only one that offers a stable and usable stand for multiple monitors. Again, the Court finds Planar's objections to go to the weight and not the admissibility of Dr. Akin's testimony.

### 3. Benefits of the Patents

Planar argues that Dr. Akin should not be permitted to opine about the benefits of the patents-in-suit and their value because his expert report only discusses generally benefits of multiple monitors without any nexus to the patented products. Planar's motion ignores a large

portion of Dr. Akin's opinion. The Court has reviewed the expert report of Dr. Akin and finds this objection to be without merit.

### 4. Doctrine of Equivalents

Planar's final argument challenges the portions of Dr. Akin's rebuttal report that the parties refer to as Section 9.iii.a, in which Dr. Akin applies the doctrine of equivalents. Planar does not challenge Dr. Akin's qualifications, underlying analyses, methodology, or any other aspect of his testimony that is generally the subject of a challenge under *Daubert*. Instead, Planar argues that the doctrine of equivalents is not available to Mass as a matter of law because the relevant specification was amended during patent prosecution and thus the patentee cannot get through equivalents what he gave up during prosecution. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002) (*Festo I*) (holding that when a patentee narrows a claim in response to a rejection, "he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent"). Although this type of motion is more appropriate as a motion for summary judgment or a motion *in limine*, in the interests of efficiency, the Court will resolve it now.

An accused element may be found to be equivalent if it performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation. *See HSM Portfolio LLC v. Elpida Memory Inc.*, 160 F. Supp. 3d 708, 714-15 (D. Del. Feb. 11, 2016). Patent prosecution history may limit equivalents. *See Festo I*, 535 U.S. at 733-34. Prosecution history estoppel, however, does not completely bar the benefit of the doctrine of equivalents from all litigation related to the amended claim. "The scope of the estoppel must fit the nature of the narrowing amendment." *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed. Cir. 2010). A court must look at the rejection and the subsequent amendment to determine whether estoppel precludes the particular doctrine of equivalents argument being made. *Alfred E.*

*Mann Found. for Sci. Research v. Cochlear Corp.*, 96 F. Supp. 3d 1028, 1045 (C.D. Cal. 2015).

The patentee can rebut application of prosecution history estoppel by showing one of three

exceptions, one of which is that the amendment only had "a tangential relation to" or "was

peripheral, or not directly relevant, to the alleged equivalent." *Festo Corp. v. Shoketsu Kinzoku*

*Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) (*Festo II*). Thus, the patentee can

show that it did not surrender the particular equivalent in question. *Id.* at 1368.

      In response to rejections during patent prosecution, the patentee of the '331 Patent

narrowed his claims. As relevant here, he narrowed Claim 9 to require "a support arm that

extends on either side of the column." ECF 90-1 at 12. Planar appears to argue that whenever a

specification has been amended, there is a *per se* bar on using the doctrine of equivalents. As

noted above, that is not accurate. Mass is only barred if the patentee surrendered the particular

equivalent in question.

      Dr. Akin opined that Planar's products directly infringe. Dr. Yee, however, opined that

Planar's products do not infringe, in part because they have two separate arms that are each on

one side of the support column, and thus there is not one support arm on both sides of the support

column. In his rebuttal report, Dr. Akin testified that to the extent Dr. Yee is correct, then

Planar's products, even if they do not directly infringe, nevertheless infringe through the doctrine

of equivalents. Dr. Akin concluded the accused products' arms are equivalent because they are

part of an integrated structure that performs the same function in the same way to achieve the

same result. It is this rebuttal testimony that Planar disputes.

      Planar argues that its products cannot be equivalent because they have two separate arms

that are not on "both sides" of the support column but instead are each on only one side of the

support column. The disputed claim term is part of Claim 9, which does not contain the "single

piece support arm" term. The patentee did not surrender anything in Claim 9 relating to a single

piece support arm. That was surrendered relating to Claim 1 and is thus only tangential,

peripheral, and not directly relevant to Claim 9. *See Festo II*, 344 F.3d at 1369. Accordingly,

Planar's argument based on the stand having two separate arms instead of one single piece arm is

not relevant.

What the patentee surrendered during the patent prosecution for Claim 9 is anything other

than the product having "a support arm that extends on either side of the column." Because the

patentee did not surrender anything in Claim 9 relating to a single piece support arm, however,

and the Federal Circuit instructs that in patents the article "a" means one or more,[7] then what the

patentee surrendered for purposes of Claim 9 still permits one or more support arms as long as

they extend on either side of the column. That is what is purportedly contained in Planar's

accused products under Dr. Akin's alternative analysis under the doctrine of equivalents and thus

prosecution history estoppel does not apply to exclude his opinion.

Moreover, even if a single piece support arm is required, the Court has already concluded

that Planar's accused products have one integral arm and that there is an issue of fact whether the

advertised configuration with the arms separated is illusory. Therefore, the argument that

Dr. Akin's testimony must be excluded because Planar's products cannot be equivalent because

they necessarily do not have one integral arm on both sides of the support column is rejected.

**H. Expert Testimony of Dr. Raymond Yee**

Dr. Yee's expert report includes testimony that certain prior art taught various elements

of the '978 Patent, including certain of the means-plus-function elements. Invalidity by

anticipation analysis for means-plus-function elements requires that the relevant structure in the

---

[7] *KCJ Corp.*, 223 F.3d at 1356.

prior art device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. *See Fresenius USA, Inc. v. Baxter Int'l Inc.*, 582 F.3d 1288, 1299 (Fed. Cir. 2009). This is the "function-way-result" test.

Mass argues that Dr. Yee's testimony is insufficient because he does not explain or analyze how the prior art structure performs the same function in substantially the same way to achieve the same result as the structure identified in the Court's claim construction order for any of the means-plus-function terms in the '978 patent. Particularly, Mass argues that Dr. Yee fails to provide *any* analysis of the "way" part of the function-way-result test. Mass's challenges to Dr. Yee's testimony are the same for the various terms analyzed by Dr. Yee. Accordingly, the Court will use the term "support means for supporting the arm assembly from the base member" as a representative term in resolving Mass's objections.

Dr. Yee states in his report that for his function-way-result analysis he adopts the definitions of function, way, and result from Dr. Akin's September 2015 Report. *See, e.g.*, ECF 101-2 at 78 (Yee Rep. Ex. 9 at 7).[8] Dr. Yee notes that Dr. Akin had identified the function as supporting the arm assembly from the base member; the way as a combination of various pressures, frictions, forces and/or torques resulting in equilibrium; and the result as the arm assembly being supported. *Id.* at 78-79. Dr. Yee concludes that the prior art discloses a structure "for supporting the arm assembly from the base member using the combination of various pressures, frictions, forces and/or torques resulting in equilibrium to achieve the result of the arm

---

[8] Because Dr. Yee's report was being produced on the same day as Dr. Akin's 2017 report, Dr. Yee reserved the right to alter his analysis if Dr. Akin identified different functions, ways, or results in his 2017 report. Mass argues that Dr. Yee's reliance on an outdated report renders his testimony outdated and unreliable. The fact that Dr. Akin had not yet submitted his 2017 report is not a valid basis for excluding Dr. Yee's report. To the extent Mass believes that Dr. Akin's 2017 report undermines the conclusions from Dr. Yee's report, Mass may challenge Dr. Yee on cross-examination.

assembly being supported." *Id.* at 79. Dr. Yee then discusses the specific structures in the prior art that perform the purported function of keeping the arm assembly supported.

Although Dr. Yee's analysis could be more robust, it does not involve a topic requiring extensive scientific experiments or similar analyses. He summarily identifies the patented structures, adopting Mass's definitions through Dr. Akin's report, but then specifically identifies in more detail the prior art structures that perform the same function of keeping the arm assembly supported so that the monitors do not fall down. Mass criticizes Dr. Yee for summarily concluding that these prior art structures use a combination of various pressures, friction, forces or torques to support the arm assembly, without more detailed analysis of how exactly the structures support the arm assembly, but this is an objection more suited to cross examination. Mass's argument goes to weight, and not admissibility. The Court similarly finds Mass's objections to the remainder of Dr. Yee's prior art analyses go to weight, and not admissibility. Accordingly, Mass's motion to exclude the prior art testimony of Dr. Yee is denied.

## CONCLUSION

Planar's motions for summary judgment (ECF 85, 86, 87, 96, 100) are DENIED. Planar's motion (ECF 102) under *Daubert* to exclude portions of the expert report and testimony of J.E. Akin, Ph.D., P.E. is DENIED. Planar's motion (ECF 98) under *Daubert* to exclude the expert report and testimony of Peter Heuser, J.D., is GRANTED IN PART AND DEFERRED IN PART. Mass's motion (ECF 101) under *Daubert* to exclude portions of the expert report and testimony of Raymond Yee, Ph.D., P.E. is DENIED.

**IT IS SO ORDERED**.

DATED this 19th day of June, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge